*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-AA-189


KATHERINE M. TOLSON, PETITIONER

v.

DEPARTMENT OF THE INTERIOR, RESPONDENT.


On Petition for Review of an Order of the
District of Columbia Office of Administrative Hearings

(2019-DOES-2010)

(Argued February 17, 2021                    Decided May 27, 2021)

*Paul J. Sampson* for petitioner.

*Derek S. Hammond*, Assistant United States Attorney, for respondent. *Michael R. Sherwin*, Acting United States Attorney, and *R. Craig Lawrence* and *Jane M. Lyons*, Assistant United States Attorneys were on the brief for respondent.

Before GLICKMAN, EASTERLY, and DEAHL, *Associate Judges*.

EASTERLY, *Associate Judge*: "The purpose of the District's unemployment compensation statute [D.C. Code § 51-101 to 127] is to protect employees against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs." *Nwokwu v. Allied Barton Sec. Serv.*, 171 A.3d 576,

582 (D.C. 2017). To that end, unemployment benefits are presumptively available to all qualifying employees who lose their job. An employer may rebut the presumption that an employee is entitled to benefits by showing that, based on all the circumstances surrounding the employee's departure, the employee assumed the risk of unemployment and left their job of their own free will. But the fact that the burden of proof and persuasion is placed on the employer to show the employee left voluntarily does not alter the proper focus of the voluntariness inquiry, namely, the state of mind of the employee.

This court has previously recognized, consistent with the unemployment regulations, that an employee does not leave their job voluntarily if they reasonably believe they are about to be fired. Here, the employer communicated to the employee that a "final" decision had been made that she was "unsuitable" for her job, and the employee believed she was about to be fired. But because of other procedural requirements, termination was not in fact imminent. The Office of Administrative Hearings Administrative Law Judge determined that the objective reality—the fact that termination procedures had not yet commenced—was dispositive and concluded that the employee resigned from her position of her own volition. But the employee's reasonable understanding of her circumstances

controls. Because the record evidence indicates that the employee reasonably believed she was about to be fired, we reverse and remand.

## I.     Facts and Procedural History

Katherine Tolson began working as an administrative support assistant in human resources at the U.S. Department of the Interior in 2011. In 2017, the Department initiated a security "reinvestigation" of Ms. Tolson, with which Ms. Tolson cooperated. She was informed of the conclusion of the reinvestigation in a three-page document dated October 1, 2019, with the subject "Notification of Determination and Referral." The document detailed both "Adjudicative Findings" and the "Adjudicative Conclusion." In the latter section, the document informed Ms. Tolson that she had been found "unsuitable for Federal service." The first sentence of the penultimate paragraph of the document stated that "[a] copy of this final determination is being provided to your organization[']s Employee & Labor Relations Branch who will work with your supervisor to initiate an appropriate administrative action *which includes your removal from Federal service*." (emphasis added). The second sentence of this paragraph "advised that this unfavorable suitability determination is final and is not subject to further appeal."

A second "Notification of Determination and Referral" was generated ten days later. This October 11, 2019, document was a duplicate of the October 1, 2019, document—it had the same number of pages and paragraphs, with the same page breaks, and the same content—with two exceptions. At the beginning of the notification, the security designation for Ms. Tolson's position as Non-Sensitive/Moderate Risk was corrected to Non-Sensitive/Low Risk. And at the end of the notification, the first sentence of the penultimate paragraph was abridged so that it stated only that the Department's "Employee & Labor Relations Branch . . . will work with your supervisor to initiate an appropriate administrative action" and made no reference to "removal from Federal service." Nothing in the notification called attention to either of these alterations.

On October 22, 2019, Ms. Tolson submitted a two-sentence letter to the Department of the Interior stating that she was resigning and identifying her last day of work. Thereafter, she applied for unemployment benefits with the Department of Employment Services. A DOES claims examiner acknowledged Ms. Tolson's explanation that "she quit work because her employer was going to terminate her," but concluded that her departure was voluntary based on the Department's representation that she had "quit her job due to . . . personal reasons and she did not receive any Notice of Proposed Removal." The claims examiner then concluded

that because Ms. Tolson had not proved that she left "for good cause connected with the work,"[1] she was not entitled to unemployment benefits.

Ms. Tolson appealed this determination to OAH. Human resources specialist Elizabeth Poore appeared for the Department of the Interior at the hearing before the OAH ALJ. The essence of Ms. Poore's testimony was that at the time Ms. Tolson resigned, she had not yet been formally terminated by the Department. Although she had received a letter informing her she was unsuitable for federal service, she resigned before the Department initiated the discharge process. Ms. Poore acknowledged that the unsuitability notification, dated October 1, 2019, had included a reference to "removal from federal service" as a consequence of the unsuitability determination.

Testifying on her own behalf, Ms. Tolson explained that she had been working since she was sixteen, and that she had twenty-five years of service in the federal government, nine of them at the Department of the Interior. She stated that she had

---

[1] Even an employee who leaves their job voluntarily may be eligible for benefits if they prove they left for "good cause connected with the work," which is defined in the regulations to include racial or sexual discrimination or harassment, the failure to be paid, or unsafe work conditions. *See* 7 D.C.M.R. §§ 311.1, 311.4, 311.7 (2021).

resigned from the Department "[b]ecause I was being removed." She elaborated that she believed she was being terminated "[b]ecause of my security clearance"— apparently a reference to her unsuitability determination[2]—and she noted that "[a]t the bottom of the letter it said I couldn't appeal." She had spoken to Human Resources after she received the unsuitability notification, and someone (she could not remember who, even though she worked in HR) told her to "go ahead and resign" and keep a "clean record."[3] She also testified that she believed "they w[ere] going to have an action process for me," meaning "[a] removal action." She explained that she "didn't want that on my record. So I went ahead and resigned."

After Ms. Tolson testified, her counsel recalled Ms. Poore for further questioning. Ms. Poore then mentioned for the first time that Ms. Tolson had been issued two unsuitability notifications, the first on October 1, 2019, referencing her "removal from Federal service," and the second on October 11, 2019, with the

---

[2] Although the unsuitability notification indicated that a review of Ms. Tolson's "security file" prompted the reinvestigation, Ms. Poore clarified that Ms. Tolson did not have a security clearance.

[3] Ms. Poore confirmed that she knew Ms. Tolson "called quite a few people at the time . . . she got [the unsuitability determination] letter," but she did not know who specifically Ms. Tolson spoke to or who would have given such advice.

"removal" language deleted.[4]   Ms. Poore explained the second unsuitability notification was generated because the first one "made it sound like removal was a foregone conclusion," when in fact Ms. Tolson had a separate right to notice of her proposed termination and the opportunity to challenge that action.  In response to counsel's questions, Ms. Poore conceded that Ms. Tolson was not advised in the unsuitability notification of her separate rights to notice and an opportunity to be heard with respect to an adverse action such as termination.  Ms. Poore also conceded that there was no other position Ms. Tolson could have filled at the Department with an unsuitability determination, and based on her twenty-five years working in human resources, she opined that it was "highly unlikely" someone deemed unsuitable could keep their job.

Ms. Tolson was not recalled to the stand after Ms. Poore testified for the second time, and the hearing concluded.  The ALJ subsequently issued a written order.  In her findings of fact, the ALJ explained that, independent of the suitability assessment, the "Employer's discharge process require[d the] Employer to initiate an administrative action to separate an employee"; the employee had a right to notice

---

[4] The Department of the Interior did not include the October 11 letter in its proposed exhibits and it was not entered into the administrative record.  The letter was included, however, in Ms. Tolson's appendix on appeal without objection from the Department.

and an opportunity to be heard before a final decision was made; and the employee also had a right to appeal to the U.S. Merit Systems Protection Board. The ALJ further found that "[a]t the time [Ms. Tolson] resigned, [the Department of Interior] had not initiated an administrative action to remove [her], nor had [the Department] issued [her] a notice of proposed removal, which is necessary to discharge an employee from federal service." The ALJ then concluded the Department had carried its burden to show that Ms. Tolson "resigned voluntarily, and not in the face of imminent termination." The ALJ explained that the Department "had not initiated an action to remove [her] based upon the suitability determination," and she did not credit Ms. Tolson's testimony that "employees in human resources told her that a discharge action would be taken." The ALJ also stated she was "not persuaded by [Ms. Tolson's] assertion that her separation was a for[e]gone conclusion because she had been found unsuitable for continued federal employment," noting "Ms. Poore could not state definit[ively] that [Ms. Tolson] would be separated as a result of the suitability determination." Because the fact that she "might be separated . . . at some point in the future . . . is not sufficient cause to resign," the ALJ concluded, Ms. Tolson "jumped the gun."

The ALJ also addressed whether Ms. Tolson had demonstrated that she resigned for good cause connected with the work such that she would still qualify

for unemployment benefits. Although she found that Ms. Tolson "testified credibly . . . that she resigned because she believed[] that she was going to be fired and that it would be better for her to resign so that she would have a clean record," the ALJ concluded that this "personal reason[]"did not constitute good cause.

## II.    Legal Framework

"[A]ny individual who [has] left [their] most recent work voluntarily without good cause connected with the work, as determined under duly prescribed regulations, shall not be eligible for benefits . . . ." D.C. Code § 51-110(a)(1) (2014 Repl. & 2020 Supp.). Because the unemployment benefits statute is meant to be interpreted "liberally" so as to "minimiz[e] the economic burden of unemployment," *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 170–71 (D.C. 1979), it is presumed that an individual's departure from their job is involuntary, unless the individual admits it was not. 7 D.C.M.R. § 311.3. The employer bears the burden of production and persuasion to rebut that presumption by "present[ing] evidence sufficient to support a finding . . . that the leaving was voluntary." *Id.*; *see also Green v. District of Columbia Dep't of Emp. Servs.*, 499 A.2d 870, 875–76 (D.C. 1985). Voluntariness must be assessed "from the circumstances of a particular case," and it must be determined "that the leaving was voluntary in fact, within the ordinary meaning of the word." 7 D.C.M.R. § 311.2; *see also Wash. Chapter of Am.*

*Inst. of Architects v. District of Columbia Dep't of Emp. Servs.*, 594 A.2d 83, 86 (D.C. 1991) (explaining voluntariness must be assessed "by reference to all the circumstances surrounding the [employee's] decision to leave").

Obviously when an employee is fired, their departure from their job is involuntary. But an involuntary departure may also occur if "the employee's action was compelled by the employer rather than based on the employee's volition," i.e., if the employee was "encourage[d]" or "coerce[d]" to resign. *Hockaday v. District of Columbia Dep't of Emp. Servs.*, 443 A.2d 8, 10 (D.C. 1982). If an employee is told by the employer they must quit or they will be fired, the presumption of involuntariness will not be rebutted. *See Thomas*, 409 A.2d at 170 (recognizing that the "'quit or be fired' situation" "operates to the advantage of the employer" and concluding that "it is not proper to take such a quit, tendered in lieu of termination, out of its context and regard it as dispositive on the issue of voluntariness for unemployment benefits determination purposes"); *accord Green*, 499 A.2d at 876 ("This court deems involuntary a resignation in the face of imminent discharge."). If, on the other hand, "the employer has offered solid evidence that what was communicated was merely a warning" to the employee that their performance was unsatisfactory and that they needed to "shape up or ship out," the employer may rebut the presumption of involuntariness, because "a reasonable worker in that

position should remain on the job (as the employer anticipates [they] would) and try to improve [their] performance." *Thomas*, 409 A.2d at 173 (internal quotation marks omitted).

When an employee quits out of a concern they will be fired, the imminence of potential discharge is a central concern in assessing voluntariness. *See Green*, 499 A.2d at 876 ("[T]he prospect of termination must be real." (ellipsis and internal quotation marks omitted)); *Thomas*, 409 A.2d at 172–73 (there must be "actual imminence of a feared discharge"). Thus, the departure of an employee who "giv[es] up a right to a termination hearing" may be deemed voluntary if "there is clear evidence that the employer was not really serious, or that the employer's reason for seeking the employee's discharge lacked legitimacy and the employee reasonably could have stayed on and utilized the hearing tool." *Thomas*, 409 A.2d at 173.

In short, voluntariness must be based on an individual's reasonable perception of their situation based on facts known to them.

### III.   Analysis

Ms. Tolson challenges the ALJ's determination that the Department of the Interior carried its burden to rebut the presumption that her departure was involuntary. Reviewing this issue de novo, *Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 760 (D.C. 2008) (the determination that an employee left their job voluntarily is an "ultimate fact" or a conclusion of law subject to de novo review (internal quotation marks omitted)), we agree that the ALJ erred.

The Department of the Interior presented evidence that Ms. Tolson had not in fact been fired, that she had only received notification (twice) that she was unsuitable for federal employment, and that the Department never initiated the process to terminate her because she quit first. These are the undisputed objective facts. But as explained above, in assessing whether the Department rebutted the presumption that Ms. Tolson left her job involuntarily, we must examine the situation, and specifically the Department's communications, from Ms. Tolson's perspective.

Three weeks before she submitted her letter of resignation, the Department of the Interior sent Ms. Tolson its first notification informing her that a security reinvestigation which had been initiated two years earlier was over, factual findings

had been made, and a final and unappealable conclusion had been reached that she was "unsuitable for Federal service." It further stated that her supervisor would be informed and "appropriate administrative action which include[d] [her] removal from Federal service" would be initiated. This first notification does not help the Department carry its burden to prove that Ms. Tolson left her job voluntarily. This was not "clear evidence" that Ms. Tolson should not have feared imminent unemployment. *Thomas*, 409 A.2d at 173. Rather, it supports a conclusion that Ms. Tolson thought she was about to be fired (as she testified she did) and reasonably so. *See Wash. Chapter of Am. Inst. of Architects*, 594 A.2d at 87 (presumption of involuntariness unrebutted where "[claimant] was not told improvement would result in a work relationship satisfactory to her employer" and "[t]here [wa]s no evidence that the employer offered [claimant] any palatable option other than resignation"). Indeed, Ms. Poore, the Department's sole witness, acknowledged that the wording of the first notification "made it sound like removal was a foregone conclusion."

Ms. Poore testified that the second version of the unsuitability notification was issued ten days later precisely for that reason. But critically, the Department of the Interior never elicited any testimony from Ms. Tolson about her understanding of the second notification. Evidence that the Department had sent a second notification

was not even introduced until after Ms. Tolson testified. A review of that document does not reveal an obvious message that termination was not imminent or inevitable. Preliminarily, the second notification gave no indication that its content was any different from the first. There was no header, no textual explanation, no bolding or highlighting to indicate any change had been made; and because it is the same length, with the same number of paragraphs, with the same topic sentences, it could easily be mistaken for a duplicate. Even taking note of the alteration, the notification still contained ominous language that a final, unappealable decision had been made that Ms. Tolson was unsuitable and that her supervisor would be enlisted "to initiate an appropriate administrative action." The second notification does no more work than the first to show that imminent termination was not a "real" possibility, *Green*, 499 A.2d at 876 (internal quotation marks omitted), and that Ms. Tolson's departure was in fact voluntary.[5]

---

[5] The Department argues that the issuance of the second notification demonstrated that the agency "was not acting with urgency" to initiate the process to terminate Ms. Tolson. But, as discussed below, there is no evidence that Ms. Tolson was aware that there was another process, and receipt of a second notification ten days after the first does not help the Department carry its burden to show that it was not acting in a coercive manner and that Ms. Tolson's resignation, only eleven days after receipt of the second notification, was voluntary.

To support its determination that the Department of the Interior carried its burden, the OAH ALJ looked to the "Employer's discharge process," noting that the Department would have been required to initiate a distinct administrative action to terminate Ms. Tolson; Ms. Tolson would have had a right to notice and an opportunity to be heard in that administrative action; and she would have also had a right to appeal to the U.S. Merit Systems Protection Board. But here again, the record is deficient, because there is no evidence that Ms. Tolson was aware of the procedural protections due to her in relation to her termination. The testimony about this process came exclusively from Ms. Poore.[6] Ms. Poore conceded neither of the notifications of unsuitability informed Ms. Tolson that she had a future right to notice and an opportunity to be heard with respect to any adverse action related to her "final" and "unappealable" unsuitability determination. And there was no evidence that Ms. Tolson was informed of her rights in another manner. Thus, the

---

[6] In its brief to this court, the Department of the Interior asserts that "the available appeal to a separate federal agency . . . would have drastically extended the proceedings because the [Merit Systems Protection Board] had a significant backlog in cases at the time Ms. Tolson resigned"; but there is no evidence in the record that either Ms. Tolson or Ms. Poore was aware of this circumstance. The Department also notes that "MSPB has reversed unsuitability determinations." But again there is no evidence that Ms. Tolson was aware of that possibility; to the contrary, she had twice been informed by the Department that her unsuitability determination was "final." And Ms. Poore testified that, based on her twenty-five years of experience, it was highly unlikely that Ms. Tolson could keep her job.

ALJ's determination that Ms. Tolson "jumped the gun" was unfounded where all Ms. Tolson was told was that the race was over.

Notably, the ALJ credited Ms. Tolson's testimony that "she resigned because she believed[] that she was going to be fired and that it would be better for her to resign so that she would have a clean record."[7]  Based on the record evidence, Ms. Tolson's belief was reasonable and the ALJ's finding on this point should have compelled a determination that the Department of the Interior had failed to carry its burden of proof to rebut the presumption that Ms. Tolson's resignation was involuntary.  It is immaterial that the ALJ did not credit Ms. Tolson's testimony that she was told by an unidentified individual that she should "go ahead and resign" instead of being fired.  Ms. Tolson did not have the burden of proof or persuasion to disprove the voluntariness of her departure.[8]

---

[7] The court made this credibility determination in the context of assessing whether Ms. Tolson voluntarily left her job for good cause related to the work, an analytic step we conclude the ALJ should not have reached in light of the Department of the Interior's failure to rebut the presumption of involuntariness.

[8] Likewise, it was not Ms. Tolson's burden to present evidence that her duties changed after she received the unsuitability notification, as the Department argues.

For these reasons, we reverse the ALJ's order concluding that the Department of the Interior carried its burden to prove that Ms. Tolson resigned from her job voluntarily and remand for further proceedings consistent with this opinion.

*So ordered*.